JAMS ARBITRATION

```
-----------------------------------------------------------------x
 JOSEPH LAGANI,                          :
                                         :
             Claimant,                   :   JAMS Ref. No. 1425035857
                                         :
 - vs -                                  :
                                         :
 ADWANTED USA, INC.,                     :
                                         :
             Respondent.                 :
                                         :
-----------------------------------------------------------------x
```

# FINAL AWARD (Corrected)

## I.      Background

The above-referenced Arbitration was filed before JAMS on July 27, 2021. The subject matter concerns an Employment Agreement entered into between Claimant Lagani ("Lagani") and Respondent Adwanted USA, Inc. ("Adwanted USA") on January 26, 2018. (The 2018 Agreement).  This Agreement replaced an earlier Employment Agreement that was entered into between the parties in 2017. The 2018 Employment Agreement contained an Arbitration Clause in Paragraph 11.  It reads, in pertinent part, as follows:

"If the dispute cannot be settled through negotiation, the parties agree to arbitration under New York law, and the parties further agree that such arbitration shall be administered by Judicial Arbitration and Mediation Services ("JAMS") pursuant to the Employment Arbitration Rules and Procedures and subject to the JAMS policy on Employment Arbitration Minimum Standards of Procedural Fairness.

Judgment on the Award may be entered in any court having jurisdiction.  The arbitrator may grant injunctions or other relief and, to the extent the JAMS rules conflict with New York Law, New York law shall take precedence.  You consent to using any Expedited Procedures offered by JAMS."  Ex. 1, Joint Statement of Uncontested Facts ("JSUF").

## II.  The Parties

The parties to this action are represented as follows:

**Claimant:**

Geoffrey H. Call, Esq.
Brown Rudnick, LLP
601 13th Street
Suite 600
Washington, DC. 20005

John P. McKay, Esq.
Reitler Kailas and Roseblatt, LLP
885 Third Avenue, 20th Floor
New York, NY. 10022

**Respondent:**

Robert J. Tracy, Esq.
Desiree Jamasbi, Esq.
Gibney, Anthony and Flaherty, LLP
665 Fifth Avenue
New York, NY. 10022

## III.   The Dispute

In the course of this Arbitration the parties submitted a JSUF to the Arbitrator.  For the purposes of providing background for this dispute, the Arbitrator has incorporated the following uncontested facts into this Final Award.

1. Adwanted USA is a US corporation, founded in October, 2016.  It is a subsidiary of Adwanted Group SAS ("Adwanted SAS"), a French corporation.

2. In 2016-2017, Adwanted USA's French parent developed an automated buying platform which as to be offered to advertising and media buyers in France.  The goal of Adwanted SAS was to take this platform that had been developed for European customers and bring it to the US, which had no similar product on the market.  The potential US market for the automated platform was in the range of $500 billion.  Thus, Adwanted SAS saw a huge opportunity for them in the US marketplace.

3. Lagani was contacted by an employment recruiter in December 2016, who connected him with Adwanted USA's founder and CEO, Emmanuel DeBuyck, and Andre Coste, a director of Adwanted USA, who assisted Mr. DeBuyck.

4. Following a series of introductory meetings and discussions, Mr. DeBuyck and Mr. Coste negotiated with Mr. Lagani over the terms of his possible employment by Adwanted USA.  Ultimately the parties

reached an Agreement, which was sent to Lagani for execution.  He executed the Agreement on May 26, 2017.  Lagani was hired to be the President, Sales and Business Development, of Adwanted USA.

5. In January 26, 2018 an amended Employment Agreement was signed by Lagani and Mr. Coste that replaced the May 2017 Agreement.

6. Lagani was terminated by Adwanted USA without cause on April 17, 2021.

As a result of this termination, Lagani brings three (3) claims against Adwanted USA.  Each Claim is set forth below.

## Claim 1: The $50,000 Severance Payment

7.  Lagani maintains that he is owed a $50,000 severance payment pursuant to the terms of the January 26, 2018 Employment Agreement.

8.  The specific terms of the Employment Agreement can be found at Tab 4(b) of the Parties Joint Statement of Facts and Pleadings. On Page 2 of Tab 4(b), paragraph 5, entitled "Severance" provides, in pertinent part as follows:

**5. <u>Severance.</u>**  If the Company terminates your employment agreement without Cause, the Company shall pay you a severance in an amount equal to three (3) months of your then applicable Base Salary, being paid to you and no less than $50,000 (the "Severance Amount"), <u>provided</u> that, the receipt of the Severance Amount shall be contingent on you signing a separation and release agreement in a form satisfactory to the Company.

## Claim 2: The Sales Commissions

Lagani's second claim is that Adwanted USA breached Section 4 of the Employment Agreement by failing to pay Lagani the proper sales commissions to which he was entitled.  Lagani maintains that he is entitled to 3% in commissions for all the sales made by his department in 2020.   The Sales Incentive Provision is located at Section 4 of the 2018 Employment Agreement and reads in pertinent part as follows:

**4. <u>Sales Incentive:</u>** In addition to your Base Salary, you will be entitled to a performance-based bonus equal to (3%) of Net Revenue that is generated by your own sales performance for calendar years 2018, 2019 and 2020 (the "Commission").  The Commission shall be paid by March 1st of the following calendar year subject to Net Revenue Payments being received by the Company by such date.  For purposes of this Agreement, "<u>Net Revenue</u>" is defined as the sales commission on media that are actually collected by the Company from its clients. The commission is earned over a 12-month rolling period in case your contract has been terminated during the course of the calendar year.

## Claim 3:  Securities Fraud

As Adwanted USA was a start-up with no income, the parties agreed that as part of Lagani's compensation he was to be paid in part by cash and in part by Restricted Stock Purchases.  Those purchases are described in the JSUF and set forth below, as well as the Resolutions taken by the Board of Directors with respect to the amount of shares which were issued by Adwanted USA to its parent Adwanted SAS.

## RESTRICTED STOCK PURCHASES

- In May of 2017 a Restricted Stock Purchase Agreement was executed by Lagani and Coste, acting for Adwanted USA.  Lagani was provided a valuation of the Fair Market Value of common shares as of March 2017, prepared by Meld Valuation and showing the value of the shares as $0.02 per share.

- In January of 2018 a Restricted Stock Purchase Agreement was executed by Lagani and Debuyck acting for Adwanted USA.

- In April of 2019, a Restricted Stock Purchase Agreement was executed by Lagani and Debuyck, acting for Adwanted USA.

- In February of 2020, a Restricted Stock Purchase Agreement was executed by Lagani and Debuyck, acting for Adwanted USA.

- In December 2020, a Restricted Stock Purchase Agreement was executed by Lagani and Debuyck, acting for Adwanted USA.

- Finally, in January of 2021, a Restricted Stock Purchase Agreement was executed by Lagani and Debuyck, acting for Adwanted USA.

**ADWANTED USA SALE OF SHARES TO ADWANTED SAS**

- By unanimous written consent of the Board of Directors of Adwanted USA, dated December 31, 2019, the following resolutions were taken:

  **"Resolved**, that 83,664,632 (eighty three million six hundred and sixty four thousand six hundred and thirty two dollars) shares of common stock, par value 0.00001 per share (the "Stock Allotment") be and are hereby issued to Adwanted SAS;

  **Resolved,** that in consideration for the Stock Allotment Adwanted SAS shall pay to the Corporation the purchase price of $1,673,292.64 (one million six hundred seventy three thousand two hundred and ninety two dollars and sixty four cents).

- Lagani did not sign this resolution on the December 31, 2019 date.  On or about March 3, 2020, Adwanted USA, through its attorney Paolo Grassi, sought Lagani's signature on "Written Consent of All the Shareholders" which was backdated to December 31, 2019. The written consent of all shareholders provided, in part, as follows:

  **"Resolved**, that the Certificate of Incorporation of the Corporation is hereby amended by striking out Article Fourth thereof and by substituting it with the following new Article:

  **"FOURTH**: The total number of shares of all classes of stock which the corporation shall have authority to issue is one hundred million

(100,000,000.00) shares of common stock, par value $0.00001 per share
("Common Stock").

- Lagani signed the Written Consent on or about March 3, 2020 and returned
  it to Mr. Grassi as requested by email the same day.

In Claimant's Third Claim, he maintains that Respondent committed securities
fraud by diluting the value of the company and thus rendering his shares essentially
worthless.  Claimant maintains that this was done without his approval, and that
over two months passed since Respondent took this action before it provided
Claimant with a backdated Resolution for his signature.  Claimant concedes he
signed the backdated Resolution.

## THE HEARING

A hearing was held on this matter on June 2d and 3d, 2022 at the
JAMS offices in New York City.  Following the receipt of the
Hearing Transcripts and the parties' post-hearing briefs, the
Arbitrator advised the parties that she had a list of questions about
the Third Claim that needed addressing in order to complete the
Final Award.  Under the JAMS Employment Rule 22(i),  the
Arbitrator has the power to reopen the hearing. The parties agreed
to be heard on this list of questions on September 15, 2022, and
they subsequently submitted several post-hearing submissions
following the September 15, 2022 session.

**CREDIBILITY OF THE WITNESSES:**

I found all of the witnesses who testified at the hearing to be credible. The difficulty is that while each side agreed upon most of the factual findings, they disagreed on the legal implications of such findings. Thus it is my task to apply the law to the facts which the parties have set forth and reach legal conclusions thereon.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**1) Claim 1: The Severance Claim for $50,000**

I find that Claimant is entitled to the $50,000 payment set forth in the January 26, 2018 Employment Agreement.

To begin with, I find the fact that an exact number amount was included in the second Employment Agreement to be significant. Indeed, Lagani testified at the hearing that he requested that the payment amount of $50,000 be included in the January 26, 2018 Employment Agreement and Respondent agreed to and did indeed include it therein. Tr: 52:6-22; Tr: 313: 8-315.6.

 Hence I have no doubt that this number was bargained for and that both parties agreed upon it.

Respondent takes the position that it is not required to make this payment as Claimant did not sign a release that was acceptable to the Company because Claimant was not willing to release all claims it had against Adwanted USA.  I find this position untenable.

To begin with, it was incumbent upon Adwanted USA to provide a draft release to Lagani. They failed to do so and then attempted to avoid paying Claimant due to his failure to sign an acceptable release.  When I questioned Respondent's witness at the Hearing he testified as follows:

ARBITRATOR: Did you or anyone else in your group ever send a separation and release agreement to Mr. Lagani?
MR COSTE:  No, I don't think so. At least I don't remember.
Tr: 140: 8-14.

Despite not having sent a release to Claimant, Respondent did attempt to offer Lagani a payment of cash and stock in lieu of the $50,000 payment set forth in the Employment Agreement.

Respondent cannot have it both ways.  The offer of the stock/cash payment was made without a release. Respondent by its conduct is precluded from arguing that it refused to make a payment because there was no signed release.

This position is supported by case law.  See, e.g. Mulvey v. Guidance Mutual Insurance Co., 98 N.E. 3d 926 (Ct. of Appeals of Ohio, Tenth District, 2017).  The Court in Mulvey held that the employee's execution of a release was not a condition precedent to receiving the severance payment when the "company" never sent the employee the release to be signed. Id. at 23.  New York Courts have also taken the position that a party may not avoid liability under a contract in circumstances where they prevent or make impossible the performance of the other party's condition precedent to recovery. See, e.g. Lindenbaum v. Royco Prop Co., 165 A.D. 2d 254, 260, 567 N.Y.S. 2d 218, 221 (1991). ("where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it.")

In a situation such as this the Employer has all the power and if we accepted Respondent's position it would put the Employee in a position whereby they would have either have to sign whatever release the Company provided, however unfair, or allow the Employer to avoid their obligations under the Employment Agreement by simply not

providing any release at all. Their position is not only commercially unreasonable, but also not supported by case law.

Moreover, the language in the Severance Agreement does not read that Claimant is required to release all claims against Adwanted USA to receive the $ 50,0000 Severance payment. It reads that Claimant must sign a release "acceptable to the Company." Typically there is a back and forth process between the Company and the Employee before a release becomes final. While Respondent may deem Claimant's claims for Sales Commissions and relief for breach of the Securities Law to be unfounded, to force him to release those claims, worth far more than the $50,000 Severance payment, is unrealistic. If indeed Respondent were convinced that those claims were unfounded, why would it demand that Claimant be required to sign away any rights to those claims?

Respondent also explains in its Post-Hearing Brief (pg. 2) that its position that Lagani was never entitled to a $50,000 termination payment in the "Severance" clause was "inadvertent". Mr. DeBuyck, in a series of "What's App" texts claimed that the $50,000 payment "was not in the signed contract" that he had. There was a reason for that. Mr. DeBuyck was reading the wrong contract and trying to rely on the language of the earlier 2017 Agreement. Joint Exhibit 8. Respondent concedes this point in its Post-Hearing Brief (pg 2). While I am not clear as to why Respondent felt the need to emphasize this point in its

Post Hearing Brief, I assume it was to illustrate that Respondent was not acting in bad faith, but merely made a mistake.  I accept that a mistake was made and that Respondent conceded that fact.  I do not find any evidence that Respondent was willfully misrepresenting what it owed Lagani under the Employment Agreement.

.

### Claim 2: The Sales Commissions

Lagani maintains that he is entitled to a Sales Commission in the amount of $138,416.09.  The provision in his Employment Agreement reads that he is entitled to a performance-based bonus equal to 3% of Net Revenue that is generated "by your own sales performance" for calendar year 2018, 2019, and 2020.

**4. <u>Sales Incentive:</u>** In addition to your Base Salary, you will be entitled to a performance-based bonus equal to (3%) of Net Revenue that is generated by your own sales performance for calendar years 2018, 2019 and 2020 (the "Commission").  The Commission shall be paid by March 1st of the following calendar year subject to Net Revenue Payments being received by the Company by such date.  For purposes of this Agreement, "<u>Net Revenue</u>" is defined as the sales commission on media that are actually collected by the Company from its clients.  The commission is earned over a 12-month rolling period in case your contract has been terminated during the course of the calendar year.

I find that Claimant is not entitled to the Sales Incentive.  To begin with, as with the first claim, I have to look to the plain language of the Agreement, which clearly states "generated by your own sales performance."  The following facts inform my conclusion.

Firstly, Claimant showed this language to his attorney Mr. Nash who asked him if he was comfortable with the language as written.  Clearly Lagani's attorney saw a potential problem with the language and thought it was significant enough to raise with his client. (Claimant's Exhibit 3.)

Second, while Claimant raised his attorney's concerns with Respondent, he did not insist that the language be clarified. Had he done so, there would be reason to consider whether he was entitled to the 3%.  His failure to do so is fatal to this claim. (Claimant's Exhibit 3.)

Third, Claimant testified to the effect that everyone in the industry knew that the Sales Leader was entitled to a Commission on all of the earnings generated by the Group he managed. Yet the only evidence of that statement was his own self-serving testimony.

At the hearing Lagani testified as follows:

"By my sales performance, generated by my own sales performance in the media business a sales manager, their sales performance is not simply who they called that day to get the order.  Their sales performance is really the full picture, who have you brought on, how are they doing, how is the overall company doing, and how much revenue is the company doing. That is sales performance for a sales manager.  TR: 48:5-17.

Lagani testified that it was not only his understanding but an understanding that Andre Coste, Adwanted USA Director shared and agreed to in his discussion

prior to Lagani's 2017 Employment Agreement being signed.  To support this position, Lagani relies on a May 22, 2017 email to Mr. Coste, wherein he forwards an email from his personal attorney Mr. Nash, who had made comments on the 2017 draft Employment Agreement.  In the email sent by Nash to Lagani, Nash writes as follows:  "[n]ote in particular how the commissions provision (Sec. 4) still speaks of comments from your own sales efforts instead of groupwide commissions.  Are you okay with this? (Claimant's Exhibit 3).

While Lagani contends that Coste was in agreement with his (Lagani's) interpretation of the clause, at the hearing Coste testified as follows:

Q:  And did you have an understanding of what was meant by "your own sales performance" there?

A:  Yes. There were multiple discussion about that, and the idea was that the sales...these sales commissions would incentivize Joe on what he would sell himself versus what would be sold by other team members or what would be sold by I mean potentially other companies or other parties.

Q:  And did Mr. Lagani ever communicate to you that he thought he should get commissions on all sales generated?

A:  Yes.  There were back and forth discussions about that.  I mean- and we exchanged e-mail.  We had discussions I think a number of times about that, but the agreement was- ended up being that it would be on Joe's own sales.  Tr: 253:14-254.10.

…...

Q:  Before the final Agreement, did you agree with Mr. Lagani suggesting that he would be- he would be entitled to commissions for sales that he didn't bring to the company?

15

A:  No.  I mean it was suggested obviously, and we didn't agree on that basis.  This is why the final where- I mean the words in the final Agreement is that it is based on Joe's own sales.  Tr: 255:2-11.

Fourth, the parties are in agreement that no revenue was generated in 2017-2019.  It was only with the acquisition of SRDS in 2020 that Adwanted USA generated any revenue.  SRDS was a going concern that had been in business for over a century with a long sales history when it was acquired by Adwanted USA.  Thus it is difficult to contemplate what "efforts" Claimant personally made which generated sales and I find that Claimant has not proven that he is entitled to the Sales Commission.

The law supports this position.  Under New York law, [t]he best evidence of what parties to a written agreement is what they say in their writing'... Hence a written agreement that is clear and unambiguous on its face must be enforced according to the plain terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." Riverside S. Plan Corp. V. CRP/Extell Riverside, L.P. 60 A.D. 3d 61, 66 (1st Dep't 2008), aff'd 13 N.Y.3d 398 (2009).

Lagani made the argument that the fact that there were no sales until 2020 was the fault of the platform Adwanted SAS had created for European users, as it was not working effectively in the US and therefore should excuse his lack of sales in 2018-2019.  Even if we accept that statement as true, it does not change the fact that the plain meaning of the sales incentive language was to provide a commission to Lagani for sales based on his own efforts. (Claimant's Ex. 5).

Thus I conclude that Lagani has failed to establish his claim for sales commissions.

**CLAIM 3:  Securities Fraud**

Claimant's Third Claim maintains that Adwanted USA defrauded Lagani by failing to disclose as required by Delaware Law that Adwanted USA's parent had purchased Adwanted USA shares in a self-interested transaction for just 0.02 cents per share, where Lagani was told his shares were worth more when he received shares in lieu of compensation.

To begin with, Claimant maintains that Adwanted USA sold shares to its French parent Adwanted SAS at two cents per share and failed to notify Claimant in writing as required by Delaware law.

It is necessary to take a step back and review the history between the parties in order to properly evaluate this claim.

The first Employment Agreement provided to Claimant in 2017 provided for a base salary of $200,000 beginning in October 2017. (Joint Exhibit 1).  As Adwanted USA was a startup with no revenue, Lagani agreed from the outset of his employment that he would primarily accept shares in Adwanted USA in lieu of cash compensation to make up his $200,000 annual base salary. (Claimant's Ex. 7, Tr: 75:8-21, Tr: 559:8-12).  The first Employment Agreement included an initial share grant of 98,902 shares of Adwanted USA stock, and Lagani and Adwanted USA executed a companion stock purchase agreement providing that Lagani would pay .02 (two) cents per share for the 98,902 shares. Joint Ex. 1, Joint Ex. 11.

Lagani was told by both Coste and DeBuyck in May 2017 and thereafter that he could use the .02 (2 cent purchase price) for IRS tax reporting purposes. Tr: 83:14-849, 261:16-262.15, 370:16-371.2.

A valuation report was also provided by an outside firm, Meld, that concluded that Adwanted USA had a value of .02 (two cents) per share. (Joint Ex. 9), thus justifying the amount that Lagani declared to the IRS.

Throughout 2017, 2018, 2019 and early 2020, Lagani continued to receive grants of Adwanted USA shares in lieu of cash compensation to make up his $200,000 base salary.  He maintains that at no time did Coste or DeBuyck tell Lagani that his shares were only worth 2 cents per share as opposed to the $5 valuation that was based on the fact that Meld had calculated that Adwanted USA was worth $6 millon.

Lagani received the following share grants, for which he paid 2 cents per share.


Share grants:  2017:  98,902
                        2018:  125,889
                        2019:  178,523
                        2020: 120,000. (JSUF para. 9-11)


Lagani maintains that he was consistently told by Coste and DeBuyck that the shares had a value of $5 per share, based on the 2017 valuation of the Company by Meld.

18

Claimant maintains that Adwanted USA committed securities fraud when it misrepresented the value of the shares.  To establish a claim for securities fraud, Claimant must prove the following:

      1) A material misrepresentation or omission;

      2) made with scienter;

      3)  in connection with the purchase or sale of a security;

      4) reasonable reliance upon the misrepresentation or omission;

      5) resulting in economic loss and

      6) loss causation.

I.B. Trading, Inc. V. Tripoint Glob. Equities, LLC; 280 F. Supp. 3d 524, 534 (SDNY 2017), (citing Ashland Inc. V. Morgan Stanley & Co., 652 F. 3d 333, 337 (2d Cir. 2011).

If we look to the first element for a claim for securities fraud, namely that Respondent has made a material misrepresentation or omission, I find the facts support this element.  Respondent sent Claimant an after the fact document to sign (indeed, over 2 months had elapsed) to authorize the issuance of shares to the parent, SAS. Respondent admitted in its post hearing brief that without the approval of Lagani, the issuance of shares to the parent could not have proceeded. Despite that admission, Respondent went ahead with the December 31,

2019 issuance of shares to the parent without informing Lagani, a 9-10 percent minority shareholder prior to the issuance of the new shares.

The second element in a Securities fraud claim is scienter. Did Respondent knowingly try to defraud Lagani? From my reading of the facts and the testimony, it is difficult to find that this element has been met. While I find the after the fact notification was indeed a misrepresentation, the bar for a claim of scienter is high and I do not feel it has been met. Respondent had clear reasons to want to recapitalize Adwanted SAS, which had provided all of the funding for Adwanted USA as it did not become profitable until 2020. While Respondent clearly did not take Lagani's interests into account when it decided to recapitalize Adwanted SAS, I do not find the requisite proof to conclude that they knowingly tried to defraud Lagani. What is clear to me is that in the launching and carrying on of the business of Adwanted USA, there were many irregularities that were due to the nature of a startup business, cross cultural misunderstandings, and generally inept management by the Adwanted USA management. While I question many of the decisions made by management, I cannot definitively find that there was a specific intent to defraud Lagani.

Moreover, I question some of the actions of Lagani when it comes to this claim. While Lagani says he continually relied on the representations of Coste and Debuyck that his shares were worth $5 per share, Lagani purchased the shares for 2 cents per share and declared

that amount to the IRS.  The Meld valuation concluded that the shares were worth .02 (2 cents per share).  That Respondent sold the shares to the parent for the same price Lagani had always paid and declared on his income tax, along with the Meld valuation of .02 (2 cents per share). It is difficult to conclude that Lagani's continued reliance on the $5 per share amount which he claims was provided to him by Coste and DeBuyck was reasonable, especially when Adwanted USA had no sales during the years Lagani was President of Sales.   At no point did he seek his own valuation of the shares.  Moreover, he signed the back-dated stock issuance document without question.  He certainly had the opportunity to consult with his own counsel before he did this, but chose not to. Lagani was a sophisticated business person and at some point bears some responsibility for ascertaining what the company was worth before signing off on a transaction without further due diligence.

Another element of securities fraud is whether a party's reliance on the fraudulent statements is reasonable.  As explained above, I do not find Claimant's reliance on the misrepresentations by Respondent was reasonable.  Moreover, it is difficult to determine what loss Claimant suffered with respect to his shares as their value as declared by the company, by Lagani to the IRS, and by the Meld valuation was .02 (2 cents per share).  There is no guarantee that the company will continue to be successful and thus there is a real possibility that Lagani's shares

would ultimately be worth nothing.  There is also the possibility that the company will do extremely well and thus Lagani's shares will be worth considerably more than anticipated.

Despite the fact that I do not find that Claimant has established its claim for securities I nevertheless find that Lagani is entitled to receive the lost salary he forewent in lieu of shares.  It would be fundamentally unfair for Respondent to claim that Lagani was entitled to nothing more than the cash payments that were already made to him.  I concur with Claimant that he spent almost 4 years of his professional life in trying to make Adwanted USA a success.  He forewent other lucrative opportunities to do so.  There is a lot of work associated with startups that does not yield immediate results.  Respondent understands this.  For them to dismiss Lagani as a non-performer is harsh and not in my view accurate.  He should not be penalized by allowing Respondent to avoid paying what he contracted for, which was $200,000 per year. Respondent's wrongful actions in not informing Lagani in a timely fashion that his share value would essentially be almost worthless at the time the December 31, 2019 Resolution was entered into would have the result of Lagani working for a woefully inadequate salary.

**PRAYER FOR RELIEF:**

Claimant seeks the following relief:

1) Payment of the 50,000 Severance Payment;

2) Payment of $138,416.09 representing the 3% Sales Commissions;

3) A finding that the Defendant committed securities fraud and that Claimant is entitled to damages for this fraud;

4) Attorneys fees and costs of this Arbitration.

5) Interest at the statutory New York rate of 9%.


**RELIEF GRANTED**

1) I find for Claimant on Count 1, and thus he is entitled to recover the $50,000 Severance Payment set forth in the Employment Agreement dated January 26, 2018;

2) I do not find for Claimant with respect to his claim for the Sales Commissions generated by his group at Adwanted USA.  This claim is denied.

3) While I find that Respondent did not purposely intend to defraud Lagani, I do question their actions in not timely informing Lagani of the sale of shares to the parent in 2019.  Respondent acknowledged on page 15 of their Post Hearing Brief that the issuance of new shares could not have proceeded without the consent of Lagani, and yet they went ahead and issued the shares and then sought his consent after the fact.  While it is impossible to unring

that bell, it does not mean Respondent should not be held to the bargain it made with Claimant.  Thus I find that Claimant is entitled to the $200K yearly salary which Respondent agreed to pay.  I find that Lagani is entitled to the payment of $473,341.00 that represents the amount of base salary Lagani forewent based on representations from Respondent that the value of his shares was $5 per share, based upon the $6 million dollar valuation Meld,  placed on the company. To find otherwise would be fundamentally unfair to the Claimant.

4) With respect to the request for Attorney's fees, I find that Respondent should bear the costs and fees of this Arbitration.  As the predominantly successful party in this matter and taking into account what I deemed wrongful behavior on the part of the Respondent on Claim I and III, I believe fairness dictates that Claimant is entitled to receive its fees and costs for this arbitration.  After receiving Claimant's Affidavit and its description of fees expended, the Arbitrator finds that they are fair and reasonable and Respondent is hereby ordered to pay the sum of $189,843.32, representing Claimant's attorney's fees and the sum of costs and fees in this arbitration.)

5) Claimant is entitled to be awarded interest on its claims in the amount set forth in the Conclusion below.

**REQUEST FOR CORRECTION OF AWARD**

Following the Issuance of the Final Award, Respondent sent a letter to the Arbitrator dated October 27, 2022 in which it sought a correction of the (Partial)

Final Award pursuant to JAMS Employment Rule 24(j).  Rule 24(j) provides in pertinent part, as follows:

Within seven (7) calendar days after the service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and file with JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31 or on account of the effect of an offer to allow judgment), or the Arbitrator may *sua sponte* propose to correct such errors in an Award.  A Party opposing such correction shall have seven (7) calendar days thereafter in which to file and serve any objection.  The Arbitrator may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days after his or her proposal to do so.  The Arbitrator may extend the within which to make the corrections upon good cause.  The corrected Award shall be served upon the Parties in the same manner as the Award.

While Respondent claims it is seeking corrections pursuant to Article 24(j), it goes beyond the scope of the very narrow grounds provided in that Article in an attempt to raise issues that were already decided in the Final Award.  It is not appropriate for Respondent to seek to relitigate issues that have been finally decided by the Arbitrator.  I will not take up issues that have been decided but instead will confine myself to the issues of the calculations with respect to the amount of the cash payment due under the Terms of the Employment Agreement.

While maintaining its objection to the cash payment which the Arbitrator found to be owing in the Final Award, Respondent also takes issue with the amount of the payment and maintains that the figure submitted by Claimant is inaccurate.  Respondent believes the figure should be $458,211.  Claimant, in response to Respondent's request, filed a Reply Letter on November 2, 2022, in which it set forth in great detail exactly how the lost salary payment was

calculated. Significantly, it points out the fact that the January 26, 2018 Employment Agreement was not set to take effect until April 2, 2018. Consequently, the reduced salary Claimant agreed to accept on 2018 did not take effect until April, which means that the original payment structure of $8000 per month was still in place until the end of March, 2018. (Joint Ex. 2 at Para. 3, page 2.)   Hence the amount to be awarded pursuant to the Employment Agreement is actually higher than that in the Final Award.  In Claimant's Reply letter it sets forth in great detail how it came to the figure of $478,210, which is net $5000 more than the original calculation of $473,210 awarded in the Final Award.  I concur with the analysis provided by Claimant and according correct the amount of unpaid salary from $473,210 to $478, 210.

With respect to the other issues raised in the Respondent's letter of October 27, 2022, I decline to address them as they have already been raised and decided in the Final Award.  Respondent cannot seek to relegate its case by using the vehicle of 24(j) of the JAMs Employment Rules.

On November 3, 2022, Respondent sent another letter to the Arbitrator to dispute the amount of fees owed to the Claimant. I had awarded $189,843.32 in costs and fees to Claimant in the Final Award and specifically stated that I found the fees to be reasonable.  Respondent would like to open that door again, which is not proper under 24(j) of the JAMS Employment Rules. That same day, Claimant submitted a response to Respondent's November 3, 2022 letter.  In that letter Claimant submitted a correction to the amount of attorney's fees requested.  The correction would reduce the amount of fees by $2000.  This the final amount of the fees due and owing would be $187,843.32, not the original amount set forth ($189, 843.32)

## CONCLUSION (Corrected)

On Claim I, Respondent is ordered to pay the sum of $50,000 to Claimant. Interest at the statutory New York rate of 9% shall begin to run 30 days from the date Claimant was terminated by Respondent and shall continue to run until this sum is paid in full.

On Claim III, Respondent is ordered to pay the sum of $478, 210 to Claimant. Interest shall begin to run from the date of Claimant's termination and shall continue to run until this sum is paid in full.

Attorney's fees and costs in the amount of 187,843.32 shall be paid within 30 days of the receipt of the FINAL AWARD (CORRECTED).  Interest at the statutory New York rate of 9% shall begin to run commencing 30 days after receipt of the Final Award and shall continue to run until the amounts granted to Claimant for its fees and costs are paid in full.

Any other relief not specifically mentioned in this FINAL AWARD (Corrected) is hereby DENIED.

The FINAL AWARD (Corrected) shall be enforceable in any Court of competent jurisdiction.

**SO ORDERED**:                    December 6, 2022

_Lorraine M. Brennan, Arbitrator_